## Jonas Ball *vs.* Henry Gilbert & Trustee.

A wager on the event of an election is illegal and void.

When the parties to a wager on the event of an election place money in the hands of a third person, as stakeholder, he is immediately liable, in the trustee process, to a creditor of either of them.

When one who is charged, in the court of common pleas, as trustee of another, under Rev. Sts. *c.* 109, appeals to the supreme judicial court, and is charged there also, he is not entitled to any costs on his appeal.

This was an action of assumpsit, in which the declaration alleged that " the said Gilbert, at Boston, on the seventh day of November 1844, for value received of the plaintiff, drew his order, in writing, under his hand, of that date, directed to James Cheever, therein and thereby requesting said Cheever to pay to the plaintiff the sum of one hundred dollars; and the plaintiff, on said seventh day of November, at said Boston, presented said order to the said Cheever for his acceptance and payment, which the said Cheever then and there refused to do; of which the said Gilbert then and there had due notice, and was requested to pay the same; whereby he became liable." There were also the money counts.

The said Cheever, on whom said order was drawn, was summoned as the trustee of the defendant, and the writ was served upon him on the 27th of November 1844.

At the January term of the court of common pleas, in 1845, the principal defendant was defaulted. At a subsequent term, the trustee filed his answer, which was as follows :

" In September or October 1844, Henry Davis and the defendant Gilbert came to my counting room, and placed in my hands the sum of one hundred and seventy five dollars,

Ball *v.* Gilbert & Trustee.

Gilbert one hundred dollars, and Davis seventy five dollars, which I was requested to hold and dispose of upon the following terms, as contingencies ; that is to say, if Henry Clay was elected the next president of the United States, I was to pay the said sum of one hundred and seventy five dollars to said Gilbert ; and if Henry Clay was not so elected, I was to pay said sum to said Davis. I was about to make a memorandum in writing, to which Mr. Gilbert objected, and said there was no need of any ; that Mr. Davis was a gentleman, and would not sue back ; and for himself, he would sooner have his hand cut off than to sue for it, or do any thing dishonorable about it. I accordingly made no memorandum, and took the money. On the 15th of January 1845, when the result of the election was ascertained to my satisfaction, I paid said sum of one hundred and seventy five dollars to said Davis, and had not then, nor have at any time ever received any notice or direction from said Gilbert, not to pay over said money, or any part of it, to said Davis, either personally or in writing from him, or by any one acting or assuming to act as agent of said Gilbert. In the latter part of November 1844, a person whom I suppose, but do not know, to be Ball, the plaintiff, presented to me a draft, in the common form, purporting to be signed by Henry Gilbert, to pay to said Ball (I think) one hundred dollars, for value received. I do not know whether the signature was the handwriting of said Gilbert, or not ; and he has never said any thing to me on the subject, before or since. Said draft had no reference to any bet made by said Gilbert, nor to the presidential election ; nor did it contain any notice or direction not to pay any money, in my hands, to said Davis, nor to refund to said Gilbert, or to pay to said Ball, or any other person, any money said Gilbert had deposited in my hands. The person who presented said paper did not direct me not to pay said money to any person but himself, nor give any directions as to said money ; nor did he assume to act, or appear to act, for said Gilbert, but for himself alone. I have no recollection of any transaction with said Gilbert, except

that described above, when the said Davis placed money in my hands, to be paid over as then directed; which direction was never countermanded by said Gilbert, in any way, to my knowledge."

The court of common pleas charged said Cheever, on his aforesaid answer, and he took an appeal to this court.

*W. Hilliard*, for the plaintiff.

*Hallett*, for the trustee.

SHAW, C. J. We do not think it necessary, in this case, to enter on the general discussion whether, in this Commonwealth, a wager on an indifferent subject, in which the parties have no other interest than that created by the wager itself, is a legal contract, or one which may be enforced in a court of justice. In England, it has been reluctantly held, until recently, and still is, unless changed by statute, that for an equal wager, upon an indifferent subject, depending upon a contingency, though of a trivial nature, an action may be maintained; *Good* v. *Elliott*, 3 T. R. 693; though in that case a very able dissenting opinion upon the general ground was given by Mr. Justice Buller.

But even in England, the general rule is held subject to so many restrictions and exceptions, that it remains applicable to very few cases. If the wager be upon a game or other trans action prohibited by law; if it draw into question the rights, feelings, interests or quiet of other persons; if it promote any violation of law, or operate as an incitement to a breach of the peace; if it be contrary to good morals or sound public policy, the wager is void. In Massachusetts, it is believed no action has been sustained upon a wager; perhaps because none has been brought. We are not aware that there has been any direct adjudication on the subject. As far as judicial opinions have been indirectly expressed, they have been adverse to such an action. *Amory* v. *Gilman*, 2 Mass. 1. *Babcock* v. *Thompson*, 3 Pick. 446. And Chancellor Kent, in his Commentaries, considers the law so settled in Massachusetts. 3 Kent Com. (3d ed.) 278.

But it is perhaps useless to speculate upon the genera.

question of the legality of wagers, on indifferent subjects of contingency. The more precise question here is, whether a wager upon the event of an election to a public office, depending upon popular suffrage in this Commonwealth, is valid, and constitutes a binding contract. It seems to us sufficient to state the question. The answer is too obvious to admit of doubt. And it seems to us, that upon principle, such a wager is equally void, whether it be upon the election of an officer of the United States, of the state government, of a county, town, parish, or other aggregate corporation, depending on suffrage. The very theory of such popular institutions is, that the person elected to office is placed there by the free choice of the majority of persons free to inquire and judge, free to will and determine, and free to act with purity and intelligence, uninfluenced and unseduced by interested, sinister, or corrupt motives. If the persons voting act otherwise, they act without regard to the fitness of the candidate, or to their own sense of duty. Upon the practical maintenance of this theory, in its purity and perfection, or as near an approximation to it as the infirmities and vices of society will permit, depend the utility, the safety and the stability of all popular institutions, relying upon popular suffrage for their basis and operation. And it is obvious that the more extensive and general the right of suffrage is, the more easily it may be abused and perverted, and the more important it is that its purity should be guarded and preserved. The more general the right of suffrage, the smaller the proportion of power which the vote of each one carries, the more easily is it influenced, and, if voters should ever become venal, the smaller the price at which each can be influenced or controlled.

If one bet can be made on an election, many can be made. If small sums can be staked, large ones can. So that, on a great and exciting popular election, a large amount of money may depend on the result. All those who are acting together will have a common, and may have a large, pecuniary interest in the issue. And it is conformable to the most obvious

Ball *v.* Gilbert & Trustee.

principles of economy, and dictated by the common motive to human action, self-interest, that those who are to gain or lose a large sum of money, upon the happening of an event which is contingent, should make a reasonable outlay of money, to influence and bring about that event. This, therefore, they will be likely to do, without regard to the social and political merits of the election. It may happen — in fact it does often happen — that a few thousand, or even a few hundred, votes may decide the election of a State ; and the election of a State may decide that of the Union. If a few thousand dollars will command or influence such a number of votes, would it not be presuming too much on pure, disinterested virtue, to believe that they would not be applied. And such influence is to be brought to bear, not merely on the few hundreds or thousands, who may turn the scale, but upon the whole body of voters, on both sides.

But money may be applied to effect the result, not only in the coarse, palpable and offensive form of bribery, by the direct purchase of votes, but in other modes quite as efficacious, and not less detrimental to the public interest. It may be applied, by the managers of the respective parties, to the provision of treats and other gratifications ; to the opening of houses of entertainment, to which partisans may resort at free cost, where the passions may be stimulated, the moral sense perverted, and all idea of social duty and personal responsibility overwhelmed in mere blind partisan feeling and desire of triumph, which lose sight of the object for which the right of suffrage is conferred. An election so influenced could not be regarded as the expressed will of an intelligent constituency ; it would violate the whole theory, on which the right of suffrage is founded, and destroy the confidence of all judicious persons in that particular power of the people, which has been regarded as the principal security for permanent, regulated, constitutional liberty. If it be true that wagers on elections would have any tendency to create such a pecuniary interest in their result, as we have no doubt they

have, we can have no hesitation in saying, that all such wagers are illegal and utterly void.

But the position here taken is well supported by authority. It was held, in England, that a wager on the event of an election of a member of parliament was void; but that was a bet between voters. *Allen* v. *Hearn*, 1 T. R. 56. So in Pennsylvania. *M'Allister* v. *Hoffman*, 16 S. & R. 147. *Smith* v. *M'Masters*, 2 Browne, 182. So in New York. The first case was that on an election in which the parties were voters; one party had voted, but by possibility the other party might have voted after the bet was made, and some stress was laid on this circumstance. *Bunn* v. *Riker*, 4 Johns. 426. Afterwards the same decision was given upon a bet made after the voting had closed, and it could not influence the particular result. *Lansing* v. *Lansing*, 8 Johns. 454. And the same decision, on general grounds, was made in several cases. *Vischer* v. *Yates*, 11 Johns. 23. *Yates* v *Foot*, and *Denniston* v. *Cook*, 12 Johns. 1, 376. *Rust* v *Gott*, 9 Cow. 169. The same doctrine has been held in Rhode Island and other States. In Rhode Island, an able opinion was given by Chief Justice Eddy, in the case of *Stoddard* v. *Martin*, 1 R. Isl. Rep. 1, and also stated in very good note in 9 Cow. 175.

Supposing, then, the contract to be illegal and absolutely void, what are the rights and obligations of the respective parties under it. The law will not lend its aid to carry into effect an illegal contract, if it be executory, nor to restore the party who has paid money on it, if executed. They are *in pari delicto.* The winner cannot maintain an action against the loser to recover it if not paid, nor the loser to recover it back when paid.

A question might arise, whether the stakeholder might not stand on the same footing, and be held to be amenable to neither party for money received on such a wager; but we think it clear that in no proper sense can the stakeholder be regarded as a party to the illegal contract, or *in pari delicto.*

Ball *v.* Gilbert & Trustee.

He is a mere depositary of both parties for the money de-posited by them respectively, with a naked authority to deliver it over on the proposed contingency. If the authority is actu-ally revoked before the money is paid over, it remains a naked deposit, to the use of the depositor. *Cotton* v. *Thur-land,* 5 T. R. 405. *Lacaussade* v. *White,* 7 T. R. 535. It was said by Le Blanc, J. in *Vandyck* v. *Hewitt,* 1 East. 98, that the authority of *Lacaussade* v. *White* had been much canvassed in *Howson* v. *Hancock,* 8 T. R. 575. See also the remarks of Mansfield, C. J. in 3 Taunt. 284, and of Law-rence J. in 8 East, 382, *note.* But the distinction between those cases is quite obvious. The former was upon an illegal wager, against the stakeholder, after the event had happened, but before the money had been paid by the stakeholder to the winner. It remained in the hands of the stakeholder as a naked deposit, with authority to pay it over upon the con-tingency; the bringing of the action was a revocation of the authority, so that it became a deposit to the plaintiff's use.\* In *Howson* v. *Hancock,* the money had been paid over to the winner; and then it stood upon the same footing as if paid by the loser himself, who, being *in pari delicto,* could not maintain an action to recover it back. The same principle was settled in a case already cited for another purpose. *Vischer* v. *Yates,* 11 Johns. 23.

We think the money deposited by each party was a simple, naked deposit, respecting which the agreement to pay it over to one, according to the result of the pending presidential election, and not executed by actual payment, was wholly inoperative and void; and then, by implication of law, the money was so deposited to the use of the depositors respec-tively; and that an action for money had, and received would

---

\* In Evans's Essays on the action for money had and received, (Amer. ed.) 46 – 48, it is said that the report of *Lacaussade* v. *White,* 7 T. R. 535, is "sub-stantially wrong;" that the action was brought by the winner, and not the loser; that the loser availed himself of the illegality of the contract, to avcid performing his engagement, and in addition to this, wished to retain what he had received as the consideration for a contract which he had elected to vazate, and which, therefore, was in effect paid without consideration.

lie for each party for the amount so deposited by him.  S(
that, at the time of the service of this writ, November 27th
1844, Cheever held $100 as a deposit to the use of Gilbert,
and if he was liable to be charged as trustee at that time, il
is no good answer, that afterwards, in February, and when
the result of the election was ascertained, he paid over the
amount to Davis, the winner.   It was a payment in his own
wrong.

If it be urged that the contract was voidable, and could
only be avoided by the party himself who had made the
deposit ; that it was a personal privilege to rescind it, which
he might exercise or not, by notice to the depositary not to
pay over; and that no such notice, or notice of the revocation
of his authority, was given personally by the principal defend-
ant to the trustee ;  we think the argument cannot avail.    The
contract, as between the parties to the wager, was not voida-
ble only, but absolutely void ; not as injurious to the rights of
one party, which he may avoid at his election, but as contrary
to public policy, and wholly void, and needed not the act or
will of the party to rescind it.

The contract being void between the parties, the money in
the hands of the stakeholder becomes a naked deposit to the
use of the depositor, and is precisely within the provisions of
the trustee law.   He has effects of the principal defendant
intrusted and deposited in his hands, liable to be attached.
Rev. Sts. c. 109, § 4.

As an owner of money or other property may give it away
without consideration, if he can do it without injury to his
creditor or other third person, so he may authorize one holding
money for his use to do the same.   If, therefore, such stake-
holder has paid over the money, with the authority of the
depositor, before notice of the revocation of such authority,
and before the right of any third person has intervened, the
depositor, as we have seen, cannot recover it back.    In the
present case, the money had not been paid over when the
attachment was made ;  no formal act of revocation on the
part of the depositor was necessary ;  the attachment was an

official revocation by rendering the depositor liable by law to answer to the attaching creditor. The service of the process, therefore, being thus a revocation of the authority of the stakeholder to pay over to Davis the money deposited by Gilbert, the depositary, Cheever, became chargeable as the trustee of Gilbert, to the amount of that deposit; and any payment afterwards was a payment in his own wrong.

*Trustee charged.*

A question having arisen upon the trustee's claim for costs, the court are of opinion that as he had appeared at the first term at the court of common pleas, and submitted himself to examination, he was entitled to his travel and attendance in that court, to be taxed, together with $3 for his answer; all to be deducted from the funds in his hands. Rev. Sts. c. 109, §§ 49, 50. But as he appealed from the judgment of that court, charging him as trustee, under which he might have safely paid the money, the court are of opinion that he is entitled to no costs afterwards.